IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:15-CR-12-TAV-CCS |
| | ) | |
| WILLIAM D. WOODEN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case was before the Court on October 6, 2015, for a suppression hearing on the Defendant's Motion to Suppress [Doc. 17], filed on July 2, 2015. Assistant United States Attorney David Jennings appeared on behalf of the Government. Assistant Federal Community Defender Benjamin Sharp appeared on behalf of Defendant Wooden, who was also present. The Court took the motion, response, testimony, exhibits, and arguments under advisement on October 6, 2015.

### I. POSITIONS OF THE PARTIES

The Defendant is charged with one count [Doc. 1] of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). This charge stems from a residential search that occurred on November 19, 2014. The search of the residence and the Defendant's person yielded multiple firearms and ammunition.

The Defendant moves [Doc. 17] to suppress a Taurus 38 revolver, a Jager 22 semi-automatic rifle, a single short rifle, and all ammunition in connection to a searched that took place at 644 Old Tellico Highway in Monroe County, Tennessee on November 19, 2014. The Defendant argues that his Fourth Amendment right against unreasonable searches and seizures was violated by law enforcement who executed a warrantless search of the home, and that no exception to the warrant requirement permitted the search. Therefore, the firearms, ammunition, and any statements provided by the Defendant should be suppressed as fruit of the poisonous tree.

The Government responds [Doc. 18] that the search of the home was lawful. The Government explains that the Defendant gave consent to the officers to enter the home, and once inside, the officers obtained verbal and written consent from a second individual in the home, Janet Harris, for the home to be searched. As a result, the Government argues that the seizure of the first rifle was lawful because it was in plain view immediately after the officers entered the home, and the seizure of the second rifle was likewise lawful because it was discovered after Ms. Harris gave consent for the home to be searched. Finally, the Government argues that the seizure of the revolver on the Defendant's person was likewise lawful as a search incident to the Defendant's arrest. In the alternative, the Government argues that the search of the Defendant's person was lawful as a result of a properly executed Terry frisk.

2

## II. SUMMARY OF THE EVIDENCE

Two witnesses were called during the October 6 suppression hearing: Corporal Conway Mason and Deputy Christopher Williams of the Monroe County Sheriff's Office. Both witnesses provided testimony on behalf of the Government.

### A. Testimony of Corporal Conway Mason

Corporal Mason has worked for the Monroe County Sheriff's Department since 2006. Prior to joining the sheriff's department, he worked for the Sweetwater Police Department from 1999 until 2006. He testified that on November 19, 2014, he was on duty as a narcotics investigator in Monroe County, Tennessee. His duties the night included locating a Ben Harelson in an attempt to serve a warrant for his arrest. At around 1:00 a.m., Corporal Mason arrived at a single-wide mobile home located at 644 Old Tellico Road in Monroe County to look for Mr. Harelson whose vehicle was observed at the residence earlier that day. Corporal Mason explained he was in plain street clothes and was driving an unmarked vehicle. Two other officers, Deputies Chris Williams and Brian Millsaps, accompanied Corporal Mason to assist in arresting Mr. Harelson. As Corporal Mason approached the mobile home and knocked on the front door, one of the deputies remained posted in front of the home while the other one remained out back behind the home.

Corporal Mason testified that he knew that the Defendant and a women by the name of Janet Harris lived in the mobile home. Corporal Mason explained that he had met Ms. Harris while previously conducting a routine "knock and talk," an investigative technique where officers talk to residents of a home and ask for consent to search the home in an effort to locate

3

narcotics, at this mobile home. Corporal Mason also knew Ms. Harris from coaching her grandson in football. Through these prior dealings, Corporal Mason had learned that Ms. Harris had a criminal history which included a drug felony conviction related to methamphetamine. In addition, Corporal Mason had learned from Ms. Harris during the "knock and talk" that the Defendant was likewise a convicted felon.

Corporal Mason testified that during the night in question, he knocked on the front door of the mobile home and was greeted by the Defendant. Corporal Mason could not recall if he identified himself as a police officer. Corporal Mason testified that he asked to speak with Ms. Harris. The Defendant indicated that Ms. Harris was home and he would go get her. Corporal Mason than stated, "Do you mind if I step inside?" Corporal Mason testified that the Defendant responded, "Yes, come on in," and I'll go get her." Corporal Mason testified that there were no further exchanges between him and the Defendant at that point, and that the Defendant gave no indication that he did not want Corporal Mason inside the home. Corporal Mason explained that once he stepped inside the home, he saw the Defendant reach behind the front door then turn around and walk down the hallway. As the Defendant turned the corner to walk down the hallway, Corporal Mason observed the Defendant carrying an assault style refile and immediately instructed the Defendant to put the weapon down. Corporal Mason related that he had mistakenly left his service weapon in his vehicle, but that Deputy Williams, who had followed after Corporal Mason into the home, drew his service weapon at the Defendant. The Defendant then complied with the officers' instruction to put the rifle down, and Deputy Williams detained the Defendant thereafter. Corporal Mason recalled Deputy Williams searching the Defendant's person and removing a holster from the Defendant's right side as well

4

as ammunition. In addition, Corporal Mason stated he asked the Defendant if he was a convicted felon, and even though Corporal Mason already knew the Defendant was, the Defendant confirmed that he was a convicted felon.

Once the Defendant was detained, Corporal Mason sat down to speak with Ms. Harris about Mr. Harelson. Corporal Mason testified that he asked Ms. Harris for permission to look around the home for Mr. Harelson, and that Ms. Harris gave him verbal consent to do so. Upon inspection, Corporal Mason discovered other individuals in one of the bedrooms as well as drug paraphernalia in plain sight. In a second bedroom, Corporal Mason observed in plain sight a firearm (rifle) sitting against the wall. Knowing that both the Defendant and Ms. Harris were convicted felons, Corporal Mason returned to Ms. Harris and asked for written consent to search the residence further. Corporal Mason testified that he read to Ms. Harris a consent form to search, and that she agreed to sign the form. The Government entered into evidence Exhibit 1, a Monroe County Sheriff's Department Consent to Search form signed by Ms. Harris. Corporal Mason testified that the Defendant was present at the time Ms. Harris gave verbal and written consent to search the home and at no time did the Defendant say anything or object to a search taking place.

On cross-examination, Corporal Mason expounded upon his law enforcement experience. Specifically, Corporal Mason testified that while he was with the Sweetwater Police Department from 1999-2006, he served in narcotics and was a K-9 handler. Once he joined the Monroe County Sheriff's office in 2006, he was an agent within the narcotics unit until 2010 and then served as a detective for two years before coming back to narcotics in 2012.

5

Case 3:15-cr-00012-TAV-CCS   Document 22   Filed 10/23/15   Page 5 of 16   PageID #: 125

Corporal Mason reiterated that on the night in question, when he came into contact with the Defendant, he was driving an unmarked vehicle, he had nothing on him indicating that he was a police officer, and he could not recall if he had identified himself as law enforcement. Corporal Mason could not remember if Deputies Williams and Millsaps had ridden together or were in separate vehicles, but he did recall that they had arrived in a marked police cruiser. In addition, Corporal Mason could not recall if the porch lights to the mobile home were on, but believed that the Defendant would have been able to see the marked police cruiser despite the lack of street lights in the immediate area. Corporal Mason explained that he had requested back-up because in his experience, when serving an arrest warrant, people tend to sometimes run. Corporal Mason clarified that in this particular case, he was attempting to serve a misdemeanor arrest warrant on Mr. Harelson.

Corporal Mason was shown a picture of the mobile home and marked on the picture where he and Deputy Williams stood prior to entering the home. Deputy Williams stood on the ground, facing the front of the home, on the right side of the front porch while Corporal Mason spoke with the Defendant at the door. Corporal Mason was unsure as to the exact location of Deputy Millsaps since he had gone to stand behind the mobile home. Corporal Mason testified that his conversation with the Defendant took place at the front door of the mobile home while he held back a screen door and the Defendant held open the actual door to the home. Corporal Mason stated that he asked the Defendant if he could speak with Ms. Harris, and recalled the Defendant saying, "I'll go get her." Corporal Mason testified that he subsequently asked if he could come inside the home and was positive that the Defendant said "Yes." Corporal Mason explained that he would not have entered the home had the Defendant not given consent. A

6

collection of photographs depicting the front of the mobile home, as well as the front door, was entered into evidence as Exhibits 2, 3, 4, and 5.

Corporal Mason testified that once he entered the home, he observed the Defendant reach behind the door, but it was not immediately apparent what the Defendant was doing. As the Defendant turned to walk down a hallway, Corporal Mason realized that the Defendant was holding a gun. Corporal Mason testified that he ordered the Defendant to put down the weapon and that the Defendant complied. Corporal Mason explained he was unsure of Deputy Williams' exact location at this point, but knew Deputy Williams was behind him. The Defendant was charged by the State of Tennessee as a felon in possession of a firearm and possession of a schedule VI drug. A narrative written by Corporal Mason, depicting the events of November 19, 2014, and the charges, was entered into evidence as Exhibit 6. Corporal Mason testified that the state charges were later dismissed for lack of probable cause. Corporal Mason was then shown an Affidavit of Complaint in the General Sessions Court of Monroe County, Tennessee in which the affidavit incorrectly listed the address of the residence as 644 Tellico Street instead of 644 Tellico Highway. Corporal Mason explained that the typo was an accident due to some confusion of the streets in that area. The affidavit was entered into evidence as Exhibit 7.

### B. Testimony of Deputy Christopher Williams

Deputy Williams has been employed with the Monroe County Sheriff's Department for four years as a patrol officer. On November 14, 2014, Deputy Williams was on duty and assisted Corporal Mason in attempting to serve an arrest warrant. He arrived at 644 Tellico Highway alone, was in a marked police cruiser, and was in uniform. He recalled that Deputy Millsaps was

also in his uniform but Corporal Mason was not. Deputy Williams explained that his job on the night in question was to help take Mr. Harelson into custody.

Deputy Williams testified that after arriving at the residence, he stood at the bottom of the front porch while Corporal Mason knocked on the front door of the mobile home. Deputy Williams could not hear the conversation that transpired between Corporal Mason and the Defendant, but explained that it was brief and that he subsequently observed Corporal Mason going into the home which prompted Deputy Williams to follow. Corporal Mason testified that at no time during the officers' presence in the home did he hear any objection about their presence from the Defendant.

Deputy Williams related that after he followed Corporal Mason into the mobile home, he heard Corporal Mason instruct the Defendant to put down an AR type weapon. As a result, Deputy Williams drew his service weapon and subsequently detained the Defendant by handcuffing him. Deputy Williams testified that he heard the Defendant concede to Corporal Mason that he was a convicted felon. Deputy Williams could not recall being a part of the conversation that took place between Ms. Harris and Corporal Mason regarding consent to search the home, but recalled neither the Defendant nor Ms. Harris protesting to the officers' presence or the subsequent search of the mobile home. Deputy Williams testified that he did not search the Defendant's person until sometime later after he had already been handcuffed and detained. When the Defendant's person was searched, Deputy Williams found a loaded revolver in a holster that was attached to the Defendant's belt.

On cross-examination, Deputy Williams testified that he had no firsthand knowledge whether the Defendant gave consent to Corporal Mason to come inside the home but had

8

followed Corporal Mason inside. The Defendant was detained shortly after the officers walked inside. Deputy Williams reiterated that Corporal Mason was not wearing anything that would have indicated that he was law enforcement, and he could not recall any specifics about the lighting outside or around the mobile home. Deputy Williams also testified that Deputy Millsaps did not come inside the home until Corporal Mason verified that Mr. Harelson was not there.

### III. FINDINGS OF FACT

Based upon the testimony and exhibits presented at the October 6 suppression hearing, the Court makes the following findings of fact:

On November 14, 2014, while on duty as a narcotics investigator, Corporal Mason arrived at 644 Tellico Highway in Monroe County, Tennessee around 1:00 a.m. with Deputies William and Millsaps in search of Mr. Harelson who had a warrant for his arrest. Corporal Mason had prior knowledge that the occupants of the mobile home, Ms. Harris and the Defendant, were convicted felons. When the officers arrived at the address, Corporal Mason walked-up the front porch and knocked on the door while Deputy Williams stayed on the ground by the bottom of the porch and Deputy Millsaps stood out back behind the mobile home. The Defendant answered the door, and Corporal Mason asked to speak with Ms. Harris. The Defendant indicated that Ms. Harris was home and that he would go get her. Corporal Mason then asked if he could come inside the home and the Defendant affirmatively responded that he could. The exchange between Corporal Mason and the Defendant was brief and out of hearing range from Deputy Williams.

As Corporal Mason stepped inside the home, he observed the Defendant reach behind the door and begin to walk towards a hallway. Once the Defendant began to turn and walk down the hallway, Corporal Mason realized that the Defendant was carrying a rifle and ordered the Defendant to drop the weapon. At this point, Deputy Williams had entered the home as well and drew his service weapon at the Defendant who then complied and set down the rifle. Deputy Williams detained the Defendant by placing him in handcuffs. Corporal Mason asked the Defendant if he was a convicted felon and the Defendant responded in the affirmative.

Corporal Mason then spoke with Ms. Harris who gave verbal consent for Corporal Mason to look around the home for Mr. Harelson. As Corporal Mason walked through the home, he observed in plain view a second firearm that was leaning against the wall in one of the bedrooms. Corporal Mason then asked Ms. Harris for written consent to search the home further. Ms. Harris agreed to the search by signing a consent form. At no time did the Defendant object to the officers searching the home or to Ms. Harris giving verbal or written consent to search.

At some point after the officers began searching the home and while the Defendant was being detained, Deputy Williams searched the Defendant's person and found a loaded revolver in a holster on the Defendant's belt.

## IV. ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses." U.S. Const. amend. IV. "It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Welsh v. Wisconsin, 466 U.S. 740, 748, 104 (1984) (internal quotation omitted). This "overriding respect for the sanctity

10

Case 3:15-cr-00012-TAV-CCS   Document 22   Filed 10/23/15   Page 10 of 16   PageID #: 130

of the home [] has been embedded in our traditions since the origins of the Republic." Payton v. New York, 445 U.S. 573, 601 (1980). Accordingly, absent consent or exigent circumstances justifying a warrantless entry into a home, a person's Fourth Amendment right is violated by law enforcement's intrusion. Id. at 589-90; United States v. Holland, 522 F. App'x 265, 273 (6th Cir. May 24, 2013).

The Defendant argues that after he advised Corporal Mason that Ms. Harris was home, the officers proceeded to enter the home without permission or a valid search warrant. Once inside the home, the Defendant claims that the officers searched the home without valid and effective consent. As a result of law enforcements' illegal entry into the home, the Defendant submits that the firearms recovered must be suppressed.

The Government argues that law enforcement's entry into the home was lawful because the Defendant gave Corporal Mason consent to enter. As a result, the Government submits that the seizure of the first rifle was proper because after the officers had lawfully entered the home, they observed the Defendant carrying a rifle down the hallway in plain view. The Government further contends that once law enforcement was in the home, Ms. Harris gave verbal and written consent for the home to be searched, thereby making the seizure of the second rifle, which was also found in plain view in one of the bedrooms, likewise lawful. Moreover, the Government submits that because the officers had knowledge that the Defendant was a convicted felon and had placed him under arrest as a felon in possession of a firearm, the seizure of the third firearm found on the Defendant's person was lawfully discovered as a search incident to arrest, or, in the alternative, a properly executed Terry frisk.

During the suppression hearing, the parties narrowed the scope of the issues and agreed that the only issue pending before the Court was whether the officers legally entered the home, *i.e.*, whether valid consent was obtained from the Defendant. Defense counsel argued that the undisputed evidence established that when Corporal Mason asked the Defendant to speak with Ms. Harris, the Defendant did not give Corporal Mason consent to come in, but advised him to wait at the door while the Defendant went and got Ms. Harris. Defense counsel argued that this testimony was not reasonably plausible because the Defendant was a convicted felon with a firearm in the home, thereby giving the Defendant good reason to deny Corporal Mason's request to come inside. The Government countered that Corporal Mason gave positive testimony that he would not have entered the home absent consent from the Defendant, that the Defendant specifically gave consent, and that at no point while law enforcement was in the home did anyone protest. Further, the Defendant offered no proof to the contrary.

A "warrantless entry is not per se unreasonable if the defendant consents to it." Holland, 522 F. App'x at 273. The government has the burden of proving by a preponderance of the evidence "clear and positive testimony" that the consent was given freely and voluntarily. Id. (citation omitted); see also Bumper v. North Carolina, 391 U.S. 543, 549 (1968). Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." United States v. McCaleb, 552 F.2d 717, 721 (6th Cir.1977). Mere submission to authority does not amount to freely and voluntarily given consent. Florida v. Royer, 460 U.S. 491, 497 (1983). Consent is coerced, and therefore invalid, if it is given in "submission to authority rather than as an understanding and intentional waiver." United States v. Jones, 641 F.2d 425, 429 (6th Cir. 1981).

12

Courts consider the totality of the circumstances in making a determination of whether consent was voluntarily given. United States v. Ward, 400 F. App'x 991, 996 (6th Cir. Dec. 1, 2010). The totality of the circumstances may include "the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." Id. (quoting United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996)).

The Defendant does not argue that he was coerced or confused about his right to give or withhold consent. Rather, the Defendant simply argues that he never gave consent in the first place. The Government provided testimony from Corporal Mason who directly and specifically stated that he asked the Defendant for permission before coming inside the mobile home and the Defendant obliged. Corporal Mason further testified that the Plaintiff gave no indication that he did not want Corporal Mason to come inside. Corporal Mason and the Defendant are the only individuals with firsthand knowledge about the brief conversation that took place at the doorway before law enforcement entered the home. The Court credits Corporal Mason's testimony and finds that it provides "clear and positive" evidence that consent was given freely and voluntarily. The only thing offered to the contrary was the Defendant's "proffer" through defense counsel that Corporal Mason was told to wait at the door while the Defendant went to get Ms. Harris. No testimony, nor any evidence (direct or circumstantial) to the contrary, was offered.

Moreover, the Court finds the lack of objection to law enforcement's presence while inside the home to be telling. Simply remaining silent and neither consenting nor expressly refusing consent does not operate as a refusal of consent. See United States v. Stanley, 351 F.
13

App'x 69, 72 (6th Cir. 2009). Any objection to a search must be expressly made. See United States v. Ayoub, 498 F.3d 532, 540 (6th Cir. 2007). Although Deputy Williams did not hear the conversation between the Defendant and Corporal Mason that took place at the front door of the mobile home, and further could not recall being a part of the conversation with Ms. Harris concerning consent to search the home, both Deputy Williams and Corporal Mason testified that once they were in the home, neither the Defendant, Ms. Harris, or any other individual present, objected to law enforcement's presence or subsequent search. By virtue of the fact that the Defendant never objected or protested to law enforcement's presence at any point while inside the home, belies the Defendant's proffer that consent to come inside the home was withheld and instead corroborates Corporal Mason's testimony that he was given direct consent to enter and that he would not have entered the home had the Defendant failed to give consent.

The Court also finds defense counsel's challenge of Corporal Mason's credibility during the suppression hearing to be without merit. Specifically, defense counsel recounted Corporal Mason's testimony in which he acknowledged that it was dangerous to work in narcotics and that he knew Ms. Harris had a criminal history prior to arriving at the residence on the night in question. Given these concessions, defense counsel found it suspect that Corporal Mason nonetheless presented in an attempt to serve an arrest warrant without being armed and without his deputies immediately nearby. In essence, defense counsel questions whether Corporal Mason's account of events is logically feasible, thereby casting doubt on Corporal Mason's testimony that the Defendant gave consent to enter the home. The Court, however, is not persuaded. Corporal Mason testified that he had his service weapon with him but had accidently left it in his vehicle when he got out of his car to serve the arrest warrant. Moreover, Deputy

14

Williams testified that the reason he stood at the bottom of the porch and Deputy Millsaps stood behind the home while Corporal Mason approached the front door alone was in case Mr. Harelson ran in an attempt to evade arrest. The Court finds the officers' testimony reasonable and well supported.

Accordingly, under the totality of the circumstances, the Court finds that the Government has proven by a preponderance of the evidence that Corporal Mason gained voluntary consent from the Defendant prior to entering the mobile home.

Finally, the Court notes that the Defendant has waived any remaining challenges otherwise raised in his brief. Therefore, because the Defendant gave consent to Corporal Mason to enter the home, the Court finds that the consent subsequently obtained from Ms. Harris to search the mobile home, which yielded the seizure of a second firearm, and the search of the Defendant's person, which yielded the seizure of a third firearm, were lawful. See United States v. Robinson, 414 U.S. 218, 235 (1973) ("[W]e hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."); United States v. Jenkins, 92 F.3d 430, 436 (6th Cir.1996) ("An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search."). Even if the Defendant had not waived these challenges, the evidence and testimony clearly indicates that the "plain view" seizure of the second rifle and propriety of the search of the Defendant's person resulting in the seizure of the third firearm were legally proper, and thus, do not warrant suppression of the evidence.

## V. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the evidence obtained from the search of the mobile home or the Defendant's person. For the reasons set forth herein, it is **RECOMMENDED**[1] that the Defendant's Motion to Suppress [**Doc. 17**] be **DENIED**.

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).